UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION


BELINDA WALKER                                          PLAINTIFF


VS.                              CIVIL ACTION NO. 3:05CV495TSL-JCS


EATON AEROSPACE, LLC                                    DEFENDANT


MEMORANDUM OPINION AND ORDER

     This cause is before the court on motion of defendant Eaton
Aerospace, LLC (Eaton) for summary judgment pursuant to Rule 56 of
the Federal Rules of Civil Procedure 56.  Plaintiff Belinda Walker
has responded in opposition to the motion, and the court, having
considered the memoranda of authorities, together with
attachments, submitted by the parties, concludes that defendant's
motion is well taken and should be granted.

     Defendant Eaton operates a plant in Jackson, Mississippi, at
which it manufactures, repairs and services hydraulic pumps and
motors, principally for use in the commercial and aerospace
industry.  Plaintiff Belinda Walker was employed by Eaton from
October 1999 until her termination in July 2004.  Following her
termination, she filed a charge with the EEOC, and ultimately this
lawsuit, charging that she was terminated on account of her race,
African-American, in violation of Title VII of the Civil Rights
Act, 42 U.S.C. § 2000e, et seq.

     The events leading to Walker's termination are largely
undisputed.  By way of background, during her tenure at Eaton, a

consistent complaint regarding Walker's job performance was her interpersonal difficulties with and unprofessional behavior toward co-workers.[1]  Walker's pattern of unprofessional behavior eventually led to the issuance of a final written warning to Walker on April 29, 2004 by her direct supervisor, Stanley Allen, her second-level manager, Amy Merkley, and the plant's human resources manager, Steve Szabo.  The warning stated: "You have demonstrated the ability to effectively perform your job but you must treat your fellow employees with the courtesy and respect they deserve if you want to continue your employment with Eaton,"

---

[1]     In a 2001 performance review, Walker's manager Clinton Pemberton wrote that Walker "works hard at accomplishing tasks, however under pressure situations she tends to lose composure and vent frustrations on others needing her assistance."  He indicated that she "need[ed] development" in four areas of competency, including interpersonal communication skills.

Walker's October 2002 performance review includes her then-supervisor Mike Hamlett's impression that Walker had "issues taking directions from other people.  At times she does not listen to people [and[ becomes frustrated with people give her data entry work."  He also indicated she "need[ed] development" in four areas of competency, including interpersonal communication skills.

Hamlett commented in an April 2003 performance appraisal that Walker "still has problems under pressure situations dealing with people," that she "takes it out on other co-workers," and "at times becomes very frustrated and has problems dealing with people, which must be improved over the next year."  Similar observations by Hamlett are included in Walker's October 2003 performance review.

In her performance appraisal for the year 2003, Walker received an overall rating rated "marginal," based on her longstanding pattern of unprofessional behavior and interpersonal problems with co-workers, and was said to "need development" in 8 of 11 areas of competency.

Hamlett reiterated earlier comments regarding her attitude toward her co-workers and her problems working with people, sentiments echoed by her second-level manager, Amy Merkley, who also indicated a need for improvement in these areas.

and [s]hould you have any further incidents of unprofessional behavior you will be subject to termination."

At the time of her termination two months later, Walker was one of four employees at Eaton whose job duties included processing parts requisitions, known as DDRMNT transactions, for repair technicians who repaired hydraulic motor pumps and motors for Eaton's airline customers.  The technicians needed the DDRMNT paperwork in order to obtain necessary parts from the stockroom.  According to Eaton, this was time-sensitive work:  Eaton's customers required that the repair work be completed within specified time frames, and every minute of delay in getting the parts was delay in getting the motors repaired and returned to the customers.  In May 2004, after repair technicians began complaining that they were having to go all over the plant looking for someone to process their DDRMNT transactions, customer service manager Sandra Taylor met with the customer support employees, including plaintiff, and explained to them that DDRMNT transactions were to be given priority over everything else, and advised them they should never, under any circumstances, refuse to process a DDRMNT transaction for a technician or send them to someone else to do the job.[2]  Subsequently, on June 10, 2004, a

_____

[2]    Although plaintiff argues in her response brief that defendant "has not produced any document that would memorialize that a meeting had taken place instructing Plaintiff that a request for a DDRMNT should take place instructing Plaintiff that a request for a DDRMNT should take priority over priority shippers," plaintiff has not refuted defendant's proof on this issue.  In this regard, defendant has presented a memorandum

repair technician, Eddie Fisher, approached plaintiff to get her to process a DDRMNT.  Walker told him she was busy and asked (or told) him to take it to another customer support employee, but that employee was away from her desk at the time.  Fisher immediately reported the incident to the aftermarket supervisor, Dwight Brown, as he had been instructed, and Brown, in turn, informed Taylor that Walker had refused Fisher's request to process a DDRMNT.  When Taylor then immediately confronted Walker about why she had refused to process the DDRMNT, Walker maintained she had not refused his request, but merely referred him to a co-worker.  Taylor told Walker she would look into the matter and get back to her.  When she went to Fisher to get his version of the incident, Fisher reiterated that Walker had refused to process his DDRMNT request, telling him she had too much other work to do, and that she had told him he needed to go to someone else.  He further reported she had a bad attitude and addressed him in an extremely aggressive tone.

In the meantime, Walker called Fisher to her desk and confronted him about why he had told Taylor she had refused to

---

documenting a May 2004 customer service meeting at which the issue of DDRMNTs were discussed, along with the deposition testimony of Sandra Taylor, who testified affirmatively that at a customer service meeting in May 2004, she told Walker and the other customer support employees that DDRMNTs were always to be given top priority.  For her part, Walker admitted in her deposition that while she does not recall the meeting, Taylor may have directed her to give DDRMNTs top priority.  In short, plaintiff has not controverted defendant's evidence substantiating the meeting and Taylor's instruction to Walker and the others that DDRMNTs be given top priority.

handle his DDRMNT request.  Fisher told his supervisor that Walker had called him over and started "getting on" him about reporting her conduct to management, and the supervisor, in turn, informed Taylor about Walker's having confronted Fisher.  Taylor talked further with Fisher, then went back to Walker, wanting to know why she had confronted Fisher instead of letting Taylor investigate the incident, as the two had discussed.  Walker responded that she wanted Fisher to know that she did not appreciate his reporting her to Taylor.

On June 14, Taylor (who is also African-American) and Merkley recommended to human resources supervisor Melissa Dickey that Walker be terminated for unprofessional conduct, namely, refusing to process the DDRMNT after having been instructed to give such requests top priority.  At the time, Dickey was filling in for Szabo, who was out of the country on vacation.  Dickey spoke with Szabo by phone, and the two decided that Dickey would speak with Walker herself, and if Walker confirmed the facts related by Taylor and Merkley, Walker would be suspended pending further investigation.

The following day, Dickey, Merkley and Allen met with Walker, who agreed she had told Fisher to get someone else to process his DDRMNT, and agreed that she had confronted Fisher about lying about her to Taylor after Taylor had told her that she would look into the situation.  At the conclusion of the meeting, Dickey

informed Walker that she was suspended from work pending further investigation.

When Szabo returned to the plant a week later, he reviewed Taylor's written statement, Merkley's statement regarding the June 15 meeting and Taylor and Merkley's recommendation that Walker be terminated, and he spoke with Merkely and Taylor regarding their recommendation, and in light of the recommendations and plaintiff's history of unprofessional conduct, decided to terminate Walker's employment.  However, company policy required the concurrence of his manager, Catherine Madeiros, who was traveling overseas.  When Szabo finally was able to get in touch with Madeiros on July 2, she approved the discharge decision, and on July 7, Szabo telephoned Walker and informed her she was terminated for unprofessional conduct effective July 2.

In the absence of direct evidence of intentional race discrimination, such as a statement or written document showing a discriminatory motive on its face, a plaintiff must establish her claim according to the familiar <u>McDonnell Douglas</u> framework. Under <u>McDonnell Douglass</u>, she must first establish a prima facie case of race discrimination by proving the following elements: (1) she is a member of a protected group; (2) she was qualified for her position; (3) she was discharged or suffered some other adverse employment action; and (4) she was replaced with a person outside of the protected class, or she was treated less favorably than similarly situated employees of a different race.  <u>Jones v.</u>

Overnite Transp. Co., 2006 WL 3627148, *2 (5th Cir. Dec. 13, 2006)
(citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973);
Okoye v. Univ. of Tex. Houston Health Sci. Ctr., 245 F.3d 507,
512-13 (5th Cir. 2001)).  If the plaintiff establishes a prima
facie case, an inference arises that the challenged decision was
the result of race discrimination, and the burden shifts onto the
defendant to assert a nondiscriminatory, legitimate reason for the
termination.  Id. If the defendant meets its burden, then the
inference against the defendant dissolves, and the plaintiff must
show that the given reason is a pretext for unlawful
discrimination.  Id.

     Here, defendant maintains that plaintiff cannot establish her
prima facie case because she cannot demonstrate either that other
similarly situated employees were treated more favorably or that
she was replaced by someone outside the protected class.  It
argues further that even if plaintiff could establish her prima
facie case, she still cannot prevail because Walker has presented
no evidence to show that Eaton's stated legitimate
nondiscriminatory reason for Walker's discharge was a pretext for
unlawful discrimination.

     Having considered the parties' evidence and argument, it is
apparent that Walker has not presented evidence to support the
fourth element of her prima facie case.  Specifically, Walker

has not offered evidence to show that other similarly situated employees were treated more favorably or that she was replaced by someone outside the protected class.

In this respect, in response to defendant's motion, plaintiff implicitly concedes she has no proof that any white employee engaged in similar misconduct and yet was not terminated. She argues, though, that she has still created a triable issue on her prima facie case because, whereas she was suspended without pay for an unreasonable period of time prior to her discharge, no white employee who has been discharged for misconduct similar to hers has been suspended without pay for an unreasonable period of time prior to their discharge. This argument fails for at least three reasons. First, there is no allegation in plaintiff's complaint that defendant's decision to suspend plaintiff without pay for three weeks before finally discharging her was discriminatory. Rather, she alleged only that defendant discriminated against her by discharging her for conduct that did not warrant discharge. Second, although plaintiff has presented a list of white employees who were discharged, she has presented no evidence as to whether or not these employees were suspended without pay preceding their termination, or for how long any of these employees may have been suspended without pay pending their discharge. Third, defendant has presented evidence that the company's policy is to suspend an employee without pay pending investigation of a recommendation for termination, and Walker has

presented no proof that the circumstances which caused her suspension to be prolonged, i.e., Szabo's absence from the plant and Madeiros' absence from the plant and inaccessibility by phone, were present in the case of any other employee's suspension pending termination.  For these reasons, the court concludes that Walker has not presented evidence tending to show that employees outside the protected class were treated more favorably than she under similar circumstances.

Plaintiff could alternatively satisfy the fourth element of her prima facie case by showing she was replaced by someone outside the protected class.  However, it is undisputed that Eaton did not hire a replacement for plaintiff's position.  Citing <u>Nieto v. L & H Packing Co.</u>, 108 F.3d 621 (5th Cir. 1997), plaintiff argues that the fact that she has no proof that she was replaced by someone outside her protected class does not foreclose her prima facie case, and indeed, the court in <u>Nieto</u> did state, "While the fact that one's replacement is of another national origin 'may help to raise an inference of discrimination, it is neither a sufficient nor a necessary condition.' <u>Carson v. Bethlehem Steel Corp.</u>, 82 F.3d 157, 159 (7th Cir. 1996)."  108 F.3d at 624 n.7. Thus, "[t]he <u>Nieto</u> opinion appears to allow courts to find a prima facie case even where an employee has been replaced by someone of the same race." <u>Byers v. Dallas Morning News, Inc.</u>, 209 F.3d 419, 427 (5th Cir. 2000).  Under this authority, the fact that plaintiff's position was not filled would not foreclose her from

proving a case of discrimination.  Id.  In all cases, however, a plaintiff must come forward with some evidence that would support an inference of discrimination.  See id. (stating that "even under an expansive understanding of the fourth prong," a plaintiff must present "sufficient evidence to convince this Court that his [race] was a motivating factor in his employer's decision to terminate him").  Here, there is no evidence of any sort suggestive of a discriminatory motive in plaintiff's discharge.

Even if plaintiff established a prima facie case of discrimination, Eaton has articulated a legitimate nondiscriminatory reason both for plaintiff's termination and for the length of her suspension preceding termination.  Plaintiff has failed to come forward with any evidence to show that defendant's reasons are unworthy of credence or for otherwise concluding that her suspension and/or discharge were discriminatory.

Accordingly, it is ordered that defendant's motion for summary judgment is granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED this 21st day of December, 2006.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE